# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE
NEWS RELEASE #075

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **6th day of December, 2016**, are as follows:

**PER CURIAM**:

2016-B -1115        IN RE: MITCHEL M. EVANS, II
    C/W
2016-B -1213

> Upon review of the findings and recommendations of the hearing committees and disciplinary board, and considering the record of these consolidated matters, as well as the briefs and oral argument, it is ordered that Mitchel M. Evans, II, Louisiana Bar Roll number 19322, be and he hereby is suspended from the practice of law for three years. It is further ordered that two years of the suspension shall be deferred. Following the active portion of the suspension, respondent shall be placed on supervised probation for two years governed by the conditions set forth in this opinion. The probationary period shall commence from the date respondent, the ODC, and the probation monitor execute a formal probation plan. Any failure of respondent to comply with the conditions of probation, or any misconduct during the probationary period, may be grounds for making the deferred portion of the suspension executory, or imposing additional discipline, as appropriate. All costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court's judgment until paid.

SUPREME COURT OF LOUISIANA

NO. 2016-B-1115
*Consolidated with*
NO. 2016-B-1213

IN RE: MITCHEL M. EVANS, II

ATTORNEY DISCIPLINARY PROCEEDING

PER CURIAM

This disciplinary matter arises from formal charges filed by the Office of Disciplinary Counsel ("ODC") against respondent, Mitchel M. Evans, II, an attorney licensed to practice law in Louisiana.

**UNDERLYING FACTS AND PROCEDURAL HISTORY**

The ODC filed three sets of formal charges against respondent under disciplinary board docket numbers 12-DB-057, 13-DB-025, and 14-DB-044. Respondent answered all three sets of formal charges, and each matter proceeded to a formal hearing before separate hearing committees. In November 2015, the three matters were consolidated by order of the disciplinary board. The disciplinary board then filed in this court's docket number 16-B-1115 a single recommendation of discipline encompassing all three sets of formal charges.

In a separate proceeding, the ODC filed two counts of formal charges against respondent. After the formal hearing, the hearing committee recommended the formal charges be dismissed, and the ODC did not object to the dismissal of the first count of misconduct. Accordingly, this opinion does not address those allegations. The disciplinary board's ruling on the second count of alleged misconduct was filed in this court's docket number 16-B-1213.

*The Bruno Matter*

On March 13, 2009, Hilda Mae Bruno hired respondent to represent her in the community property partition of her ex-husband's military retirement benefits, paying him $1,750. Respondent enrolled as Ms. Bruno's counsel of record on March 20, 2009. Thereafter, Ms. Bruno was only able to speak to respondent once despite repeated attempts to contact him. Respondent did not file a petition for partition of community property on Ms. Bruno's behalf until March 9, 2010. Thereafter, he performed no other work on the matter.

In August 2011, Ms. Bruno filed a complaint against respondent with the ODC. Respondent failed to file a written response to the complaint, necessitating the issuance of a subpoena to obtain his sworn statement. During the January 13, 2012 sworn statement, respondent blamed his secretary for his neglect of Ms. Bruno's legal matter and for his failure to respond to the disciplinary complaint. Respondent agreed to contact Ms. Bruno, complete her legal matter, and provide the ODC with a copy of documentation showing this communication and his completion of the matter. While respondent did communicate with Ms. Bruno and obtain a judgment against her ex-husband, he failed to inform the ODC of the status of the matter.

The ODC alleged respondent's conduct as set forth above violated the following provisions of the Rules of Professional Conduct: Rules 1.3 (failure to act with reasonable diligence and promptness in representing a client), 1.4 (failure to communicate with a client), 1.5(f)(5) (failure to refund an unearned fee), 8.1(a) (a lawyer shall not knowingly make a false statement of material fact in connection with a disciplinary matter), 8.1(c) (failure to cooperate with the ODC in its investigation), and 8.4(a) (violation of the Rules of Professional Conduct).

*The Bobadilla Matter*

In March 2011, Cassandra Bobadilla hired respondent to represent her in a custody matter, paying him $850. Thereafter, respondent failed to file the necessary pleadings. He also failed to communicate with Ms. Bobadilla despite her numerous attempts to contact him and meet with him at his office. Eventually, Ms. Bobadilla learned a default judgment had been entered against her and no pleadings had been filed on her behalf.

Thereafter, Ms. Bobadilla requested that respondent apply the $850 to handling her divorce from her current husband. Respondent agreed, and Ms. Bobadilla provided respondent with the necessary documents. She did not hear from him thereafter.

In August 2011, Ms. Bobadilla filed a complaint against respondent with the ODC. Respondent failed to file a written response to the complaint, necessitating the issuance of a subpoena to obtain his sworn statement. During the January 13, 2012 sworn statement, respondent blamed his secretary for his failure to respond to the disciplinary complaint. He also agreed to provide the ODC with copies of e-mails Ms. Bobadilla sent to him but failed to do so.

At some point after the sworn statement, Ms. Bobadilla paid respondent an additional $400 in court costs to finalize her divorce. Respondent is currently working on the matter to Ms. Bobadilla's apparent satisfaction.

The ODC alleged respondent's conduct as set forth above violated the following provisions of the Rules of Professional Conduct: Rules 1.3, 1.4, 1.5(f)(5), 8.1(a), 8.1(c), and 8.4(a).

*The Hollie Matter*

In February 2008, Shondra Hollie and her stepmother, Deborah Hollie, hired respondent to represent Shondra in a custody dispute. The fee arrangement was not reduced to writing, but documentary evidence shows the Hollies paid respondent $3,350.

Thereafter, respondent failed to adequately communicate with the Hollies. However, in December 2008, respondent filed on Shondra's behalf a petition to modify custody and a rule for contempt against her children's father. Following a February 1, 2010 hearing, a stipulated judgment was entered on the custody matter. Opposing counsel prepared the judgment, but the Hollies believed the judgment was not correct according to what the judge ordered at the hearing. Respondent promised to resolve the issue but did not do so after trying to contact opposing counsel three times. The Hollies were not able to communicate with respondent after August 2010, despite numerous attempts.

In October 2011, the Hollies filed a complaint against respondent with the ODC. Respondent failed to file a written response to the complaint, necessitating the issuance of a subpoena to obtain his sworn statement. During the January 13, 2012 sworn statement, respondent blamed his secretary for his failure to respond to the disciplinary complaint. He also claimed he completed the matter by resuming visitation for Shondra. Thus, he denied owing the Hollies a refund. He agreed to provide the ODC with a copy of an e-mail he claimed would support his position regarding the fee, but he failed to do so.

The ODC alleged respondent's conduct as set forth above violated the following provisions of the Rules of Professional Conduct: Rules 1.3, 1.4, 1.5(b) (the scope of the representation and the basis or rate of the fee and expenses for which the client will be responsible shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation), 1.5(f)(5), 8.1(a), 8.1(c), and 8.4(a).

4

*The Spencer Matter*

In February 2005, Stewart Spencer hired respondent to represent him in a criminal matter and a related civil matter against the arresting police department. Respondent resolved the criminal matter in Mr. Spencer's favor in 2008.

On December 16, 2005, respondent filed a lawsuit against the police department. Mr. Spencer provided respondent with a videotape of his injuries after he was beaten by the police to use as evidence in the lawsuit. Thereafter, respondent met with Mr. Spencer and his wife, defended their depositions, and obtained medical records. He never propounded discovery to the defense. However, he did attempt to depose a key witness several times; however, the deposition dates were canceled because Mr. Spencer could not afford the cost of the deposition. Respondent failed to communicate to Mr. Spencer the importance of obtaining the deposition, the costs associated with the deposition, respondent's evaluation of the weakness of the case, and the upcoming deadlines associated with abandonment.

In November 2011, Mr. Spencer filed a complaint against respondent with the ODC. Respondent failed to file a written response to the complaint, necessitating the issuance of a subpoena to obtain his sworn statement. During the January 13, 2012 sworn statement, respondent admitted he had done no work on the case since 2008 because he was having difficulty setting up the deposition of the key witness with opposing counsel.

On January 24, 2012, respondent wrote to opposing counsel threatening to file a motion to compel the taking of the deposition. On March 19, 2012, the defense filed a motion to dismiss on the grounds of abandonment. The judge signed the motion on March 21, 2012 because nothing had been filed in the case

5

since March 18, 2009. Respondent filed pleadings to appeal the ruling, but Mr. Spencer could not pay the appeal costs. In June 2012, respondent provided Mr. Spencer with his file, but he did not return the videotape documenting Mr. Spencer's injuries.

The ODC alleged respondent's conduct as set forth above violated the following provisions of the Rules of Professional Conduct: Rules 1.1(a) (failure to provide competent representation to a client), 1.3, 1.4, 1.15 (safekeeping property of clients or third persons), and 8.4(a).

As previously noted, respondent answered the formal charges filed against him in 12-DB-057, essentially denying any misconduct. The matter was then set for a formal hearing on the merits, which the hearing committee conducted in December 2012.

*Hearing Committee Report*

After considering the testimony and evidence presented at the hearing, the hearing committee made the following factual findings:

Respondent is overburdened with his responsibilities. He has too many files, inadequate office procedures, and poor recordkeeping. He lacks supervision of his files and staff, and he has consistently failed to follow up on his clients' cases, concerns, and inquiries in a timely and adequate fashion. Overall, the committee found respondent not to be credible as to accepting responsibility and when it was apparent he should make an admission to missed deadlines, telephone calls, and follow-up with the ODC. Nevertheless, the committee determined the failure to cooperate charges against respondent did not apply to his lack of cooperation before January 2012 because his negligent staff failed to make him aware of the complaints until then.

6

Regarding the specific matters subject of the formal charges, the committee found the following:

The Bruno Matter – The committee made factual findings consistent with the underlying facts set forth above. Additionally, the committee found respondent allowed Ms. Bruno's legal matter to languish from the date of hire through January 2012 due to a lack of or substandard supervision by respondent and his secretary. While respondent ultimately earned the fee he charged, Ms. Bruno has yet to receive her portion of her ex-husband's military retirement. Based on these facts, the committee determined respondent violated Rules 1.3, 1.4, 8.1(c), and 8.4(a) of the Rules of Professional Conduct.

The Bobadilla Matter – The committee made factual findings consistent with the underlying facts set forth above. Additionally, the committee found that, in essence, respondent tried to mask his neglect of Ms. Bobadilla's custody matter by handling her uncontested divorce for what he considered to be "zero attorney fees." Based on these facts, the committee determined respondent violated Rules 1.3, 1.4, and 8.4(a).

The Hollie Matter – The committee made factual findings consistent with the underlying facts set forth above. Additionally, the committee found respondent's records do little to explain the exact terms of the fee agreement between respondent and the Hollies other than showing the $3,350 received from the Hollies and one $300 court cost payment. He did not return any portion of the fee to the Hollies because he claimed he completed the legal work in this matter. Based on these facts, the committee determined respondent violated Rules 1.3, 1.4, 1.5(b), 8.1(c), and 8.4(a).

The Spencer Matter – The committee made factual findings consistent with the underlying facts set forth above. Additionally, the committee found both Mr. Spencer and respondent had questionable credibility when testifying about this

matter; however, the documentary evidence favors Mr. Spencer. Based on these facts, the committee determined respondent violated Rules 1.1(a), 1.3, 1.4, and 8.4(a).

In light of the above findings, the committee determined respondent knowingly violated duties owed to his clients and the legal profession. His conduct caused actual harm. The committee also noted that respondent is responsible for the actions of his employees and should not be allowed to avoid appropriate discipline by blaming them for his unethical conduct. After considering the ABA's *Standards for Imposing Lawyer Sanctions*, the committee determined the baseline sanction is suspension.

In aggravation, the committee found a prior disciplinary record (a 1997 admonition for taking a recorded statement from a criminal defendant despite the defendant's attorney prohibiting same), a pattern of misconduct, multiple offenses, refusal to acknowledge the wrongful nature of the conduct, vulnerability of the victims, and substantial experience in the practice of law (admitted 1989). The committee found no mitigating factors present.

Under these circumstances, the committee recommended respondent be suspended from the practice of law for two years, with one year deferred, followed by one year of supervised probation with the condition that he attend the Louisiana State Bar Association's ("LSBA") Ethics School. One committee member dissented and would recommend a public reprimand, reasoning that "all actions by Respondent or his staff were in the range of negligence only."

Neither respondent nor the ODC filed an objection to the hearing committee's report and recommendation.

*The Satcher Matter*

By way of background, Kenneth Satcher hired attorney Gordon N. Blackman, Jr. to represent him in a workers' compensation claim. During the representation, Mr. Blackman arranged for Mr. Satcher to receive supplemental earnings benefits ("SEB") payments from the workers' compensation insurer. Mr. Blackman represented Mr. Satcher until he was interimly suspended from the practice of law in Louisiana on August 6, 2009. When Mr. Satcher stopped receiving his monthly SEB payments, he hired respondent.

On October 19, 2009, respondent filed a motion to substitute counsel with the Office of Workers' Compensation ("OWC"). On October 20, 2009, respondent sent a letter to the workers' compensation insurer to let the insurer know he represented Mr. Satcher and to request the status of Mr. Satcher's SEB payments.

On January 14, 2010, respondent and Mr. Satcher entered into a contingency fee contract in the workers' compensation matter. Nevertheless, in 2011, Mr. Satcher paid respondent $550 in fees. Eventually, Mr. Satcher's workers' compensation claim prescribed, and he lost all wage benefits.

In October 2011, after the claim prescribed, Mr. Satcher hired attorney Mark Zimmerman, who was able to settle the medical portion of Mr. Satcher's workers' compensation claim for $15,000. He was not able to assist with the wage benefits claim because it had prescribed.

In November 2012, Mr. Satcher filed a complaint against respondent with the ODC, alleging respondent neglected his workers' compensation matter, allowing his claim to prescribe, and failed to communicate with him. In response to the complaint, respondent claimed he was only hired to collect Mr. Satcher's SEB payments from Mr. Blackman and not to file any pleadings with the OWC. Regarding the $550 Mr. Satcher paid him, respondent initially claimed the money

was to represent Mr. Satcher in a divorce proceeding. However, when Mr. Satcher provided copies of receipts showing the money was for the workers' compensation matter, respondent claimed the money was to conduct legal research.

The ODC alleged respondent's conduct as set forth above violated the following provisions of the Rules of Professional Conduct: Rules 1.1(a), 1.3, 1.4, and 8.4(a).

*The Bonanni Matter*

In January 2011, Amber and Stephen Bonanni paid respondent $1,800 to handle Stephen's adoption of Amber's child from a previous relationship. In December 2011, after months of inadequate communication, Ms. Bonanni was finally able to speak with respondent, who informed her that the delay in the adoption was his secretary's fault. Respondent assured her the adoption would be completed by January 2012. The adoption was not completed by January 2012, and Ms. Bonanni again attempted to contact respondent by telephone, to no avail.

Ms. Bonanni was able to make an appointment with respondent on March 5, 2012 by pretending to be a potential new client. When she and her mother arrived at respondent's office for the meeting, respondent became irate and threw them out of his office. At this time, Ms. Bonanni asked for a refund.

A few days later, the Bonannis received a certified letter from respondent in which he denied their request for a refund despite not having completed the adoption. Additionally, he informed the Bonannis that, because Ms. Bonanni was respondent's distant relative, he would be informing their mutual relatives of her behavior in his office. He also indicated he had sent a copy of the letter to Ms. Bonanni's father.

The Bonannis hired another attorney to complete the adoption, which cost them an additional $500. The new attorney obtained a final judgment of adoption on August 28, 2012.

The ODC alleged respondent's conduct as set forth above violated the following provisions of the Rules of Professional Conduct: Rules 1.1(a), 1.3, 1.4, 1.5(f)(5), 1.6 (confidentiality of information), and 8.4(a).

As previously noted, respondent answered the formal charges filed against him in 13-DB-025, essentially denying any misconduct. The matter was then set for a formal hearing on the merits, which the hearing committee conducted in April 2014.

*Hearing Committee Report*

After considering the testimony and evidence presented at the hearing, the hearing committee made the following factual findings:

The Satcher Matter – Respondent's claim that he was retained only to collect SEB payments from Mr. Satcher's prior counsel and not to pursue workers' compensation benefits was inconsistent with the documentary evidence. After firing respondent, Mr. Satcher hired a new attorney, who was only able to settle Mr. Satcher's medical benefits claim because the SEB payments claim had prescribed. Initially, respondent claimed the $550 Mr. Satcher paid him was for a divorce matter. When Mr. Satcher provided receipts for the $550 with notations indicating the payments were for his workers' compensation matter, respondent claimed the $550 was to conduct legal research. However, respondent had not done any legal research. Based on these facts, the committee determined respondent violated Rules 1.1(a), 1.3, and 1.4.

The Bonanni Matter – On January 15, 2011, the Bonannis paid respondent $1,800 to handle Mr. Bonanni's adoption of Ms. Bonanni's child. In March 2011,

11

respondent filed an intra-family adoption petition. On April 28, 2011, respondent mailed notices of the proposed adoption to the child's biological father via certified mail. On December 15, 2011, Ms. Bonanni spoke with respondent's office manager and realized nothing had happened in the adoption proceeding since May 2011. That same day, respondent reassured Ms. Bonanni he would file a motion to appoint a curator to cure the notice deficiencies. The committee then made additional factual findings consistent with the underlying facts occurring on and after March 5, 2012 as set forth above. Based on these facts, the committee determined respondent violated Rules 1.1(a), 1.3, 1.4, 1.5(f)(5), and 1.6.

The committee then determined respondent allowed Mr. Satcher's claim to prescribe. His conduct also substantially delayed the final adoption of Ms. Bonanni's child by Mr. Bonanni, but the delay does not appear to have caused injury to the Bonannis. However, by revealing confidential information about Ms. Bonanni's legal matter to her family, respondent harmed the legal profession. After considering the ABA's *Standards for Imposing Lawyer Sanctions*, the committee determined the baseline sanction is suspension. Finally, the committee determined that the only aggravating factor present is respondent's prior disciplinary record and that no mitigating factors are present.

Under these circumstances, the committee recommended respondent be suspended from the practice of law for six months, fully deferred. Additionally, the committee recommended respondent be required to refund $550 to Mr. Satcher, refund $600 to the Bonannis, attend the LSBA's Ethics School, and attend an additional hour of continuing legal education devoted to professionalism for two years.

The ODC filed an objection to the hearing committee's recommended sanction, arguing the sanction was too lenient.

*The Willis Matter*

Respondent represented Larry Willis' ex-wife, Jerri Willis, in a divorce proceeding against Mr. Willis. On February 20, 2009, respondent filed a petition for divorce on Ms. Willis' behalf. On July 12, 2009, Mr. Willis purportedly signed an affidavit, which was purportedly notarized by respondent. However, on the date Mr. Willis purportedly signed the affidavit, he was incarcerated in Texas. The affidavit was filed into the divorce proceeding on August 3, 2009.

In August 2013, Mr. Willis filed a complaint against respondent with the ODC, alleging respondent forged or had someone else forge his signature on the affidavit. Respondent denied forging Mr. Willis' signature on the affidavit or notarizing the affidavit. He claimed his secretary created the document and signed both names to the document without his knowledge or permission. During an interview with the ODC, respondent's secretary indicated she could not remember if she signed Mr. Willis' affidavit. However, she did state she routinely signed documents, including documents requiring respondent's signature, at his direction. Respondent's office manager confirmed both he and respondent's secretary routinely signed respondent's name to documents, including pleadings, at respondent's direction.

The ODC alleged respondent's conduct as set forth above violated the following provisions of the Rules of Professional Conduct: Rules 3.4(a) (a lawyer shall not unlawfully obstruct another party's access to evidence or unlawfully alter, destroy, or conceal a document or other material having potential evidentiary value), 3.4(b) (a lawyer shall not falsify evidence, counsel or assist a witness to testify falsely, or offer an inducement to a witness that is prohibited by law), 4.1(a) (in the course of representing a client, a lawyer shall not knowingly make a false statement of material fact or law to a third person), 4.1(b) (a lawyer shall not

knowingly fail to disclose a material fact when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client), 8.4(a), 8.4(b) (commission of a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer), 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation), and 8.4(d) (engaging in conduct prejudicial to the administration of justice).

## *The Westbrook Matter*

### *I. The Eviction Matter*

In November 2006, Perry Westbrook hired respondent to evict his former brother-in-law, David Broussard, from his rental property, paying respondent a flat fee of $1,700. The $1,700 included $150 for anticipated court costs and $750 for an anticipated court appearance.

On November 15, 2006, respondent sent Mr. Broussard a notice to vacate premises via certified mail. The certified letter was returned unclaimed. Respondent never filed an eviction proceeding in court on Mr. Westbrook's behalf.

Sometime in 2007, Mr. Westbrook fired respondent and requested the return of his file. Upon receipt of his file, Mr. Westbrook learned that the notice sent to Mr. Broussard had been returned unclaimed. He also found an affidavit of mailing that was never filed into court. Despite not filing anything in court or appearing in court on Mr. Westbrook's behalf, respondent did not refund any portion of the $1,700 Mr. Westbrook paid him.

### *II. The Divorce and Child Custody Matter*

In September 2006, Mr. Westbrook hired respondent to represent him in a divorce and child custody matter against Kathrine Weibel. Mr. Westbrook paid

14

respondent a total of $12,500 for this matter. Mr. Westbrook requested a written fee agreement numerous times, but respondent never complied.

During the representation, respondent handled only one hearing, which involved an exception of improper venue. Respondent prevailed on the exception, and the case was transferred to another parish. Even though Ms. Weibel was cast with the related costs, respondent directed Mr. Westbrook to pay an additional $954 to have the case transferred. Respondent filed motions on Mr. Westbrook's behalf, but none were ever heard, having been continued without Mr. Westbrook's knowledge.

Mr. Westbrook fired respondent on April 1, 2007. On February 28, 2008, Mr. Westbrook was in court with his new attorney for a hearing. Respondent was present on another matter and spoke to Mr. Westbrook's mother without Mr. Westbrook's permission. After this conversation, Mr. Westbrook's mother insisted he rehire respondent. Respondent demanded an additional $1,800 to continue the representation, which Mr. Westbrook paid. Mr. Westbrook asked for an accounting, but respondent never provided one.

A trial on the custody issue was scheduled for November 10, 2009. On the morning of the trial, respondent informed Mr. Westbrook he and opposing counsel had negotiated a custody agreement. Respondent did not discuss the agreement with Mr. Westbrook and reached said agreement without Mr. Westbrook's knowledge or consent. When respondent would not pursue a pending contempt charge against Ms. Weibel, Mr. Westbrook again fired him.

Mr. Westbrook's new attorney realized respondent had never reduced the latest judgment to writing for the court's signature. She ordered the transcript of the proceedings and drafted the judgment, which cost Mr. Westbrook additional attorney's fees and costs. Mr. Westbrook has requested an accounting from respondent numerous times, but respondent has never complied.

## III. The Allstate Matter

Respondent represented Mr. Westbrook in a claim against Allstate, his homeowner's insurance company, following a burglary at his home. Respondent accepted the case on a contingency fee basis, but despite Mr. Westbrook's numerous requests for a written fee agreement, respondent never provided one.

Mr. Westbrook fired respondent on April 1, 2007. When his new attorney learned Allstate had already denied his claim because Allstate alleged Mr. Westbrook had made material misrepresentations under oath, the new attorney terminated the representation. Three other attorneys declined to represent Mr. Westbrook, and he returned to respondent for representation.

Respondent requested an immediate $1,500 payment and a 25% contingency fee. Mr. Westbrook requested a written fee agreement numerous times, but respondent never complied. Mr. Westbrook also repeatedly requested respondent move the matter toward trial, but respondent kept telling Mr. Westbrook they were going to settle the matter. Mr. Westbrook again fired respondent and ultimately settled with Allstate on his own for $25,000.

Respondent filed a lien against Mr. Westbrook, arguing he was owed $5,000 in attorney's fees. Mr. Westbrook agreed to pay respondent the $5,000 fee to resolve the matter but argued he should get a credit for the $1,500 paid to respondent. Respondent refused to give Mr. Westbrook the $1,500 credit and never provided Mr. Westbrook with an accounting of the $1,500.

## IV. The GEICO Matter

Mr. Westbrook's ex-wife struck him with a car, and Mr. Westbrook filed a claim with GEICO, which provided the automobile insurance coverage for the vehicle. Mr. Westbrook then hired respondent to represent him in the matter. Respondent agreed to represent Mr. Westbrook for a 25% contingency fee. Mr.

Westbrook repeatedly requested a written fee agreement, but respondent never complied.

Eventually, Mr. Westbrook learned GEICO had denied his claim because his damages resulted from what GEICO perceived to be an intentional act and because respondent had withheld information from GEICO. Respondent knew for some time GEICO had denied the claim but never informed Mr. Westbrook. Consequently, Mr. Westbrook fired respondent on April 1, 2007.

Mr. Westbrook obtained new counsel. However, upon learning GEICO had already denied the claim, the new attorney terminated the representation. The new attorney did, however, file a lawsuit on Mr. Westbrook's behalf to prevent the claim from prescribing, and Mr. Westbrook paid the attorney for this service. Three other attorneys declined to represent Mr. Westbrook, and he returned to respondent for representation.

Respondent requested an immediate $1,500 payment and a 25% contingency fee. Mr. Westbrook requested a written fee agreement numerous times, but respondent never complied.

Ultimately, the matter was mediated, and the parties reached a $24,731.91 settlement. Respondent was not in the office when Mr. Westbrook arrived to receive his portion of the settlement proceeds on July 9, 2009. The disbursement statement indicated a 25% contingency fee and deducted a $1,100 Medicare lien and $8,393.75 for fees and costs related to Mr. Westbrook's divorce and child custody matter, leaving $9,256.25 for Mr. Westbrook. A check for $9,256.25 made payable to Mr. Westbrook was also with the file. However, Mr. Westbrook objected to the $8,393.75 being deducted, claiming he had already paid these fees and costs. After respondent's secretary called respondent, Mr. Westbrook took the check but noted his objection in writing on the copy of the disbursement statement left for respondent. Because the mediator's $2,360 fee was not deducted from the

17

settlement proceeds, respondent paid the mediator himself and then sued Mr. Westbrook for reimbursement.

The ODC alleged respondent's conduct as set forth above violated the following provisions of the Rules of Professional Conduct: Rules 1.3, 1.4, 1.5(a) (charging an unreasonable fee), 1.5(b), 1.5(c) (contingency fee agreements), 1.5(f)(5), 1.6, 8.4(c), and 8.4(d).

As previously noted, respondent answered the formal charges filed against him in 14-DB-044, essentially denying any misconduct. The matter was then set for a formal hearing on the merits, which the hearing committee conducted in March and June 2015.

*Hearing Committee Report*

After considering the testimony and other evidence presented at the hearing, the committee made the following factual findings:

The Willis Matter – Respondent clearly allowed his staff to sign his name to documents requiring his signature, including pleadings and affidavits. Respondent did not notarize the affidavit, and there was no intent to deceive anyone. The committee concluded this was the result of an untrained staff member thinking she was doing the proper thing. Respondent's lack of supervision and instruction resulted in his secretary believing it was appropriate to sign respondent's name on the affidavit since she had signed his name to other documents. The committee also concluded respondent's secretary more than likely signed Mr. Willis' name to the affidavit. Based on these facts, the committee found no clear and convincing evidence that respondent violated or attempted to violate the Rules of Professional Conduct in this matter.

The Westbrook Matter – In the eviction matter, the committee found that, beyond sending the initial eviction letter, respondent did little, if any, work on the

18

matter. However, respondent was prevented from pursuing the eviction because Mr. Westbrook took possession of the house, which led respondent to believe the matter was resolved. Additional delays occurred because Mr. Westbrook's ex-wife was given temporary rights to live in the house through the ongoing divorce proceedings. The failure for the eviction to occur timely resulted from circumstances beyond respondent or Mr. Westbrook's control. Thus, the committee found respondent's actions did not cause any harm to Mr. Westbrook. The committee further found respondent agreed to a $1,700 fee, which included costs. As such, Mr. Westbrook is owed a refund of a portion of the fee. Finally, the committee found Mr. Westbrook repeatedly asked for a status and an accounting, which respondent never provided. Based on these facts, the committee determined respondent violated Rule 1.5(f)(5).

In the divorce and child custody matter, the committee found respondent agreed to a fee of $12,500 for his services. Mr. Westbrook repeatedly requested a written fee agreement and a status update, but respondent did not provide either. Mr. Westbrook was satisfied with respondent's work except for respondent not moving the custody matter to trial even though the custody matter resulted in a stipulation that was beneficial to Mr. Westbrook. Respondent also filed many motions in the matter, and the continuances were not respondent's fault or atypical of trial matters. Regarding the $954 change-of-venue cost respondent directed Mr. Westbrook to pay, the committee found the payment necessary under the circumstance to move the matter forward. The committee also found that, after Mr. Westbrook fired him, respondent's communication with Mr. Westbrook's mother was improper and self-serving because Mr. Westbrook rehired respondent at his mother's insistence. When rehired, respondent demanded an additional $1,800. Mr. Westbrook requested an accounting of fees paid, which he never

19

received. Based on these facts, the committee determined respondent violated Rules 1.3, 1.4, 1.5(f)(5), 1.5(a), 1.5(b), and 1.6.

In the Allstate matter, the committee found respondent and Mr. Westbrook agreed to $1,500 fee plus a 25 percent contingency fee. Mr. Westbrook requested a written fee agreement, but respondent never complied. When Mr. Westbrook fired respondent on April 1, 2007, respondent already knew the claim had been denied. However, because he was involved in other matters, he did not keep Mr. Westbrook informed of the status of this matter. Mr. Westbrook returned to respondent because he could not find another attorney to represent him. He again requested a written fee agreement, but respondent admitted no written fee agreement was ever prepared. Because the fee agreement was never reduced to writing, the committee could not determine the purpose of the $1,500 fee, and respondent never accounted for the fee. Mr. Westbrook settled the matter himself for $25,000 but only after respondent filed the lawsuit against Allstate and handled the entire matter, resulting in Allstate wanting to settle. As such, the committee found respondent was entitled to the $5,000 fee. Based on these facts, the committee determined respondent violated Rules 1.3, 1.4, 1.5(b) and 1.5(c).

Finally, in the GEICO matter, the committee found that, just before Mr. Westbrook fired respondent on April 1, 2007, he learned his claim had been denied. Respondent was aware of the denial but failed to inform Mr. Westbrook primarily because respondent was handling several other matters for Mr. Westbrook. Mr. Westbrook's new attorney filed a lawsuit to interrupt prescription but terminated the representation because the claim had already been denied. Mr. Westbrook paid the attorney for his services and ultimately returned to respondent, as he could not find another attorney to represent him. The claim was settlement through mediation for $24,731.91. When Mr. Westbrook went to claim his portion of the settlement on July 9, 2009, the disbursement statement deducted an

20

additional $8,393.75 for fees related to the divorce and custody matter and $1,100 for a Medicare lien, resulting in net proceeds of $9,256.25 for Mr. Westbrook. Although the mediator's $2,360 fee was listed on the disbursement statement as a cost, this amount was not actually deducted from Mr. Westbrook's funds. When Mr. Westbrook complained about the deduction of the divorce and custody fees, which he claimed he had already paid, respondent's secretary called respondent. Mr. Westbrook was told he could accept the check for $9,256.25 or never get paid. Mr. Westbrook took the check but noted his objection on a copy of the disbursement statement. Regarding the mediator's fee, the committee found either respondent, his secretary, or both made errors, and this amount was not deducted from Mr. Westbrook's funds. Respondent later sent Mr. Westbrook letters trying to get him to pay the mediator fee, but he did not tell Mr. Westbrook he had made an error. Instead, respondent paid the fee himself under threat of a lawsuit from the mediator and later sued Mr. Westbrook for this amount. Based on these facts, the committee determined respondent violated Rules 1.3, 1.4, 1.5(b), and 1.5(c).

In light of the above, the committee determined respondent acted negligently, and the rule violations stemmed from mismanagement of his office and staff. The committee also found that respondent's actions did not cause any significant harm. After considering the ABA's *Standards for Imposing Lawyer Sanctions*, the committee determined the baseline sanction is suspension.

In aggravation, the committee found a pattern of misconduct and multiple offenses. In mitigation, the committee found the absence of a dishonest or selfish motive and full and free disclosure to the disciplinary board and a cooperative attitude toward the proceedings.

After also considering this court's prior jurisprudence addressing similar misconduct, the committee recommended respondent be suspended from the practice of law for six months, with three months deferred, followed by one year of

21

supervised probation. Additionally, the committee recommended respondent be required to attend the LSBA's Trust Accounting School and Ethics School. Finally, the committee recommended that respondent provide a detailed accounting of all fees received from Mr. Westbrook and refund any unearned fees.

The ODC filed an objection to the committee's report and recommendation. Specifically, the ODC objected to the committee's determination that respondent did not violate the Rules of Professional Conduct in the Willis matter. The ODC also argued the recommended sanction is too lenient.

*Disciplinary Board Recommendation*

<u>12-DB-057, 13-DB-025, and 14-DB-044</u>

After reviewing the consolidated matters, the disciplinary board determined that each hearing committee's factual findings are not manifestly erroneous and are supported by the record. The board also determined that each committee correctly applied the Rules of Professional Conduct, with the following exceptions:

In the Bonanni matter, the board rejected the committee's conclusion that respondent violated Rule 1.6. The board reasoned that the committee did not specifically find respondent revealed information about the Bonannis' legal matter to Ms. Bonanni's family members. There is no evidence in the record that respondent actually sent a copy of the March 5, 2012 letter to Ms. Bonanni's father. Respondent denied sending a copy to Ms. Bonanni's father, and although he did talk to her family members, he denied discussing her case with them.

In the Willis matter, the board agreed with the committee's conclusion that respondent did not violate any of the Rules of Professional Conduct alleged in the formal charges. However, because the committee found respondent failed to properly supervise his non-lawyer staff, which likely led to Mr. Willis' name being forged on the affidavit, the board concluded respondent violated Rule 5.3(b) (a

22

lawyer having direct supervisory authority over a non-lawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer). The board reasoned that this determination of a rule violation was appropriate because the factual allegations of the formal charges provided respondent with adequate notice that his failure to supervise his staff was an issue.

Finally, in the Westbrook divorce and child custody matter, the board rejected the committee's conclusion that respondent violated Rules 1.5(a) and 1.5(f)(5) because the committee's factual findings do not include findings of charging or collecting an excessive fee or failing to return an unearned fee. The record, likewise, does not indicate respondent charged an excessive fee or failed to refund an unearned fee.

The board then determined respondent knowingly violated duties owed to his clients. His actions caused actual harm to his clients and had the potential to cause even greater harm. The board further determined respondent's misconduct stemmed, at least partly, from his poor office management and poor staff supervision. After considering the ABA's *Standards for Imposing Lawyer Sanctions*, the board determined the baseline sanction is suspension.

In aggravation, the board found a prior disciplinary record, a pattern of misconduct, multiple offenses, refusal to acknowledge the wrongful nature of the conduct, and substantial experience in the practice of law. The only mitigating factor the board found was the remoteness of respondent's prior disciplinary offense.

After further considering this court's prior jurisprudence addressing similar misconduct, the board recommended respondent be suspended from the practice of law for three years. The board further recommended respondent refund $600 to the Bonannis and refund $550 to Mr. Satcher. Finally, the board recommended

respondent provide Mr. Westbrook with a detailed accounting and a refund of any unearned fees. One board member dissented and would recommend a three-year suspension, with two years deferred.

Respondent filed an objection to the board's recommendation. Accordingly, the case was docketed for oral argument pursuant to Supreme Court Rule XIX, § 11(G)(1)(b). On July 7, 2016, we issued a briefing notice in this matter.

<u>16-B-1213</u>

In the latter part of 2006, Olga Shirley hired respondent to represent her in a redhibition claim involving her purchase of a mobile home. The parties apparently agreed to a contingency fee arrangement, but the contingency fee agreement was never reduced to writing.

In October 2007, respondent filed a lawsuit on Ms. Shirley's behalf. On March 27, 2008, judgment was rendered in Ms. Shirley's favor, awarding her a total of $28,150 plus legal interest. The judgment further awarded attorney's fees of 25 percent because respondent told the judge that was the fee amount on which he and Ms. Shirley had agreed.

In November 2008, after its post-trial motions were denied, the defendant issued a $35,187.50 settlement check. Respondent withheld 40 percent for attorney's fees and $382.50 for expenses, leaving $20,730 for Ms. Shirley.

In May 2009, Ms. Shirley filed a disciplinary complaint against respondent. On May 20, 2011, after the ODC filed formal charges against him, respondent refunded $5,278.25 to Ms. Shirley, which effectively reduced his attorney's fees to 25 percent.

In November 2010, the ODC filed formal charges against respondent, alleging that his conduct violated the following provisions of the Rules of Professional Conduct: Rules 1.5(a), 1.5(b), 1.5(c), 3.3(a)(1) (a lawyer shall not

24

knowingly make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer), and 8.4(a).

Respondent answered the formal charges, essentially denying any misconduct. The matter was then set for a formal hearing on the merits, which the hearing committee conducted in December 2011.

*Hearing Committee Report*

After considering the testimony and other evidence presented at the hearing, the committee found the 40 percent attorney's fee was reasonable for the work respondent performed on Ms. Shirley's redhibition case because the 25% respondent stated to the judge did not include the post-trial work respondent performed. Furthermore, Ms. Shirley did not question respondent about the fee prior to filing her complaint with the ODC, and respondent reduced his fee to 25% when requested to do so. Based on these facts, the committee recommended the formal charges be dismissed.

The ODC filed an objection to the hearing committee's report and recommendation.

*Disciplinary Board Ruling*

After review, the disciplinary board determined the hearing committee's factual findings are not manifestly erroneous as they are supported by the testimony and evidence presented in the record. Based on these facts, the board determined respondent violated Rules 1.5(b), 1.5(c) and, 8.4(a) of the Rules of Professional Conduct. Specifically, the board found respondent failed to communicate the 40% contingency fee to Ms. Shirley. As such, respondent violated Rule 1.5(b). The board also found respondent's own testimony made it

clear he did not have a written contingency fee agreement signed by Ms. Shirley. Thus, he violated Rule 1.5(c). Finally, the board found that, in violating Rules 1.5(b) and 1.5(c), respondent also violated Rule 8.4(a).

The board then determined respondent negligently violated duties owed to his client, causing limited actual injury. After considering the ABA's *Standards for Imposing Lawyer Sanctions*, the board determined the baseline sanction is a public reprimand.

In aggravation, the board found a prior disciplinary record and substantial experience in the practice of law. In mitigation, the board found the absence of a dishonest or selfish motive, timely good faith effort to rectify the consequences of the misconduct, remorse, and the remoteness of the prior disciplinary offense.

After further considering the board's prior rulings and this court's prior jurisprudence addressing similar misconduct, the board ordered that respondent be publicly reprimanded.

Both respondent and the ODC filed an objection to the board's ruling. On June 29, 2016, we ordered the parties to submit written briefs addressing the issue of whether the record supports the board's report.

**CONSOLIDATION OF 2016-B-1115 AND 2016-B-1213**

On July 7, 2016, the ODC filed a motion to consolidate 16-B-1115 with 16-B-1213. On July 14, 2016, respondent filed a request for an extension of time to file his briefs in both 16-B-1115 and 16-B-1213. Respondent additionally requested that 16-B-1115 be remanded to the disciplinary board so he could submit new evidence.

In response to these various motions, on July 25, 2016, we issued an order granting the motion to consolidate and establishing a new briefing schedule for the

consolidated cases. We also referred respondent's motion for remand to the merits, and we now deny the motion to remand.

## DISCUSSION

Bar disciplinary matters fall within the original jurisdiction of this court. La. Const. art. V, § 5(B). Consequently, we act as triers of fact and conduct an independent review of the record to determine whether the alleged misconduct has been proven by clear and convincing evidence. *In re: Banks*, 09-1212 (La. 10/2/09), 18 So. 3d 57. While we are not bound in any way by the findings and recommendations of the hearing committee and disciplinary board, we have held the manifest error standard is applicable to the committee's factual findings. *See In re: Caulfield*, 96-1401 (La. 11/25/96), 683 So. 2d 714; *In re: Pardue*, 93-2865 (La. 3/11/94), 633 So. 2d 150.

The voluminous records of these consolidated matters indicate that respondent neglected numerous legal matters, failed to communicate with numerous clients, failed to provide competent representation, failed to refund unearned fees, failed to provide accountings to clients, failed to reduce contingency fee agreements to writing, failed to properly supervise non-lawyer assistants, failed to keep one client's information confidential, and failed to cooperate with the ODC in two investigations. Based on this misconduct, respondent has violated the Rules of Professional Conduct as found by the disciplinary board.

Having found evidence of professional misconduct, we now turn to a determination of the appropriate sanction for respondent's actions. In determining a sanction, we are mindful that disciplinary proceedings are designed to maintain high standards of conduct, protect the public, preserve the integrity of the profession, and deter future misconduct. *Louisiana State Bar Ass'n v. Reis*, 513 So. 2d 1173 (La. 1987). The discipline to be imposed depends upon the facts of

each case and the seriousness of the offenses involved considered in light of any aggravating and mitigating circumstances. *Louisiana State Bar Ass'n v. Whittington*, 459 So. 2d 520 (La. 1984).

At times, respondent acted negligently, but at other times, he acted knowingly. His misconduct violated duties owed to his clients and the legal profession, causing actual and potential harm. The baseline sanction for this type of misconduct is suspension.

Aggravating factors present include a prior disciplinary record, a pattern of misconduct, multiple offenses, and substantial experience in the practice of law. The only mitigating factor is the remoteness of the prior disciplinary offense.

Turning to the issue of an appropriate sanction, the board noted respondent's actions seem to stem, at least partly, from his poor office management and poor staff supervision. This court's prior jurisprudence addressing similar misconduct caused by poor office management indicates that, while a lengthy suspension is warranted, it can be appropriate to defer a significant portion of the suspension. For example, in *In re: Vix*, 08-2290 (La. 5/15/09), 11 So. 3d 1090, an attorney neglected several legal matters, failed to communicate with her clients, failed to timely refund unearned fees, and failed to cooperate with the ODC in its investigations. Finding that the attorney's misconduct stemmed from poor management of her private practice while she was dealing with an excessive case load at the indigent defender's office and her mother's health problems, and noting these issues appeared to have been resolved, the court suspended the attorney for two years, with all but three months deferred, followed by a two-year period of supervised probation with conditions.

Accordingly, we will reject the board's recommended sanction in 16-B-1115 and its ruling in 16-B-1213 and instead suspend respondent from the practice of law for three years, with two years deferred, for his misconduct in these

28

consolidated matters. Following the active portion of the suspension, respondent shall be placed on supervised probation for two years governed by the following conditions: (1) respondent shall attend the LSBA's Ethics School, (2) respondent shall refund $600 to the Bonannis, (3) respondent shall refund $550 to Mr. Satcher, and (4) respondent shall provide Mr. Westbrook with a detailed accounting and a refund of any unearned fees.

## DECREE

Upon review of the findings and recommendations of the hearing committees and disciplinary board, and considering the record of these consolidated matters, as well as the briefs and oral argument, it is ordered that Mitchel M. Evans, II, Louisiana Bar Roll number 19322, be and he hereby is suspended from the practice of law for three years. It is further ordered that two years of the suspension shall be deferred. Following the active portion of the suspension, respondent shall be placed on supervised probation for two years governed by the conditions set forth in this opinion. The probationary period shall commence from the date respondent, the ODC, and the probation monitor execute a formal probation plan. Any failure of respondent to comply with the conditions of probation, or any misconduct during the probationary period, may be grounds for making the deferred portion of the suspension executory, or imposing additional discipline, as appropriate. All costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court's judgment until paid.