# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE

NEWS RELEASE #004

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **29th day of January, 2020** are as follows:

**PER CURIAM:**

2019-B-01346        IN RE: DONALD R. DOBBINS

Upon review of the findings and recommendations of the hearing committee and disciplinary board, and considering the record, briefs, and oral argument, it is ordered that Donald R. Dobbins, Louisiana Bar Roll number 20537, be and he hereby is suspended from the practice of law for a period of one year and one day. It is further ordered that respondent shall make restitution, with legal interest, in the amount of $2,440 to Linder Smith and in the amount of $2,000 to Patsy Godfrey. All costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court's judgment until paid.
SUSPENSION IMPOSED.

Retired Judge James H. Boddie, Jr., appointed Justice ad hoc, sitting for Justice Marcus R. Clark.

Weimer, J., concurs in part, dissents in part and assigns reasons.
Crichton, J., concurs in part, dissents in part and assigns reasons.
Crain, J., concurs in part, dissents in part for the reasons assigned by Crichton, J.

1

SUPREME COURT OF LOUISIANA

NO. 2019-B-1346

IN RE: DONALD R. DOBBINS

ATTORNEY DISCIPLINARY PROCEEDING

PER CURIAM[*]

This disciplinary matter arises from formal charges filed by the Office of Disciplinary Counsel ("ODC") against respondent, Donald R. Dobbins, an attorney licensed to practice law in Louisiana.

**PRIOR DISCIPLINARY HISTORY**

Before we address the current charges, we find it helpful to review respondent's prior disciplinary history. After being admitted to the practice of law in Louisiana in 1991, respondent's first encounter with the disciplinary system occurred in April 1998, when he was admonished for failing to have a contingency fee agreement in a client matter. Less than a year later, in February 1999, respondent received a second admonition for failing to have contingency fee agreements in two client matters and failing to provide a client with an accounting in a case he handled in the early 1990's.

Then, in January 2002, this court suspended respondent from the practice of law for one year, with all but six months deferred, for commingling and converting client funds. *In re: Dobbins*, 01-2022 (La. 1/15/02), 805 So. 2d 133. Finally, in June 2005, the court accepted a joint petition for consent discipline and publicly reprimanded respondent for engaging in conduct prejudicial to the administration of

---

[*] Retired Judge James Boddie Jr., appointed Justice ad hoc, sitting for Justice Marcus R. Clark.

justice.  Additionally, the court ordered respondent to attend the next session of Ethics School offered by the Louisiana State Bar Association ("LSBA").  *In re: Dobbins*, 05-1464 (La. 6/15/05), 903 So. 2d 1129.

Against this backdrop, we now turn to a consideration of the misconduct at issue in the present proceeding.

## UNDERLYING FACTS

*Count I – The Smith Matter*

Linder Smith hired respondent to handle the succession of her sister, Brenda Smith ("decedent"), who passed away on August 30, 2006.  Respondent charged Ms. Smith a flat fee of $1,500, which she paid on November 28, 2006.

Decedent's estate contained property located in Baton Rouge, which the heirs wished to sell.  On April 23, 2007, Ms. Smith accepted a purchase agreement on the property, and the closing was scheduled for May 25, 2007.  However, respondent had not yet opened the succession or otherwise obtained court approval to sell the property.  Ultimately, the sale fell through because of respondent's continued delay in opening the succession.

Decedent was survived by her parents and several siblings, including Ms. Smith.  Although decedent left a last will and testament, it was invalid due to form. As such, the matter was considered an intestate succession.  Pursuant to La. Civ. Code art. 891, decedent's siblings were her intestate heirs, and her parents were entitled to a usufruct over her property.  On June 14, 2007, respondent filed a Petition for Possession, which failed to list or even acknowledge the existence of decedent's siblings and, instead, listed decedent's parents as the sole heirs.  Later, respondent notarized and filed an Affidavit of Death and Heirship, which also failed to name any of decedent's siblings.  On June 18, 2007, respondent obtained a Judgment of Possession that incorrectly recognized decedent's parents as "the sole and only

2

heirs" and placed them into possession of all of decedent's property. This improper judgment caused additional problems in efforts to sell the Baton Rouge property.

In August 2007, respondent received a $954.83 inheritance tax refund check on behalf of decedent's estate from the Louisiana Department of Revenue. He deposited the check into his trust account and used $940 to reimburse himself court costs and office expenses related to the succession.

In an effort to correct the improper judgment, on December 6, 2007, respondent filed an Amendment of Petition for Possession and Renunciation of Usufruct, which was intended to substitute decedent's siblings, including Ms. Smith, for decedent's parents and to renounce the parents' usufruct in favor of the siblings. Respondent failed to communicate to his client the content and effect of this pleading or the fact that he had filed same.

In January 2008, Ms. Smith fired respondent and requested a refund of the unearned portion of the $1,500 flat fee. Respondent did not provide Ms. Smith with a refund until February 20, 2009, when he sent her a check for $14.83.

In the meantime, Ms. Smith hired attorney A. P. Manint, who charged an hourly rate of $150 with an estimated total fee of $1,500 to $2,500. Mr. Manint advanced $206 in costs and agreed to defer payment of his fees and costs until after the sale of the Baton Rouge property. On April 22, 2008, Mr. Manint filed a Motion and Order to Reopen Succession and Annul Judgment of Possession and an Amended Affidavit of Death and Heirship, which listed all of decedent's heirs. Two days later, the judge signed an order reopening the succession and annulling the June 18, 2007 Judgment of Possession.

In November 2007, Ms. Smith filed a disciplinary complaint against respondent. In response, respondent claimed he proceeded with the succession the way he did because Ms. Smith wanted the Baton Rouge property sold. He claimed he explained to Ms. Smith that the siblings could refuse the succession in order to

3

allow the parents to be put into possession of the property and sell it without a problematic usufruct on the property. According to respondent, Ms. Smith agreed to proceed this way. He also claimed that he told her the property could not be sold until a Judgment of Possession was in place. Ms. Smith denied these conversations took place.

*Count II – The Larce Matter*

By way of background, on December 17, 2004, a judgment was signed ordering Lydia Larce and Willie King, Jr. to share custody of their minor child. The judgment also designated Mr. King as domiciliary parent, and a custody plan was set forth.

In 2006, Ms. Larce hired respondent to represent her in seeking to modify custody because she was having problems exercising visitation with her child. Respondent accepted the case *pro bono*, but Ms. Larce agreed to and did pay the court costs.

On March 24, 2008, respondent filed a Motion for Change of Custody and Reimbursement for Paternity Test on Ms. Larce's behalf. However, this pleading requested custody be awarded to Mr. King, the opposite outcome Ms. Larce desired. Respondent failed to correct the pleading and failed to inform Ms. Larce of his error.

A hearing on a rule to show cause and a hearing on Mr. King's Motion and Order to Set Trial on Permanent Injunctions were set for September 8, 2008. On July 17, 2008, Mr. King filed a Motion for Contempt and Incidental Issue against Ms. Larce. This matter was also set for hearing on September 8, 2008. The September 8, 2008 date was re-set for January 20, 2009. Respondent requested a continuance, and the date was re-set for February 17, 2009.

On February 9, 2009, respondent was purportedly personally served with notice of the February 17, 2009 date, but he failed to inform Ms. Larce. Neither

4

respondent nor Ms. Larce appeared on February 17, 2009, and the matter went forward in their absence with only Mr. King and his counsel present. In the afternoon, respondent's secretary informed Ms. Larce that a hearing had been scheduled for that morning. Ms. Larce immediately went to the courthouse, but the matter had already concluded.

On February 23, 2009, a judgment was issued ordering the following: (1) Mr. King was awarded sole care, custody, and control of the child and designated as the domiciliary parent; (2) Ms. Larce was awarded reasonable access to the child upon request; (3) all prior judgments and orders were set aside; (4) a permanent injunction was issued against Ms. Larce; and (5) Ms. Larce was found guilty of civil contempt for violating a preliminary injunction and sentenced to ten days in jail, suspended if she complied with the permanent injunction. Respondent was served with the judgment on March 4, 2009, but he failed to provide Ms. Larce with a copy.

After learning of the judgment, Ms. Larce fired respondent and hired attorney Evelyn Oubre to seek a new trial. Ms. Oubre filed a Motion for New Trial on March 17, 2009. However, the motion was denied as untimely.

In October 2009, Ms. Larce filed a disciplinary complaint against respondent. In response, respondent acknowledged that his initial Motion for Change of Custody and Reimbursement for Paternity Test contained an error, which he claimed he planned to address during the hearing originally set for September 8, 2008. He also claimed he was never served with notice of the re-setting of the hearing date to February 17, 2009. He acknowledged receiving a copy of the February 23, 2009 judgment and claimed Ms. Larce fired him shortly thereafter. He also indicated that Ms. Larce picked up a copy of her file from his office in April 2009.

*Count III – The Wilson Matter*

By way of background, Cynthia Wilson worked in the housekeeping department of Bunkie General Hospital ("the hospital"). On October 18, 2007, the police questioned Ms. Wilson about the theft of numerous items belonging to the hospital. Soon thereafter, Ms. Wilson resigned, and on February 12, 2008, she was arrested on a felony theft charge. On August 21, 2008, Ms. Wilson was acquitted of all charges.

Ms. Wilson subsequently hired respondent to represent her in a lawsuit against the hospital. On February 12, 2009, respondent filed a petition for damages in the matter of *Cynthia Wilson vs. Bunkie General Hospital, et al.*, No. 2009-3162 on the docket of the 12th Judicial District Court for the Parish of Avoyelles. Attorneys Randall Champagne and Kevin Riche represented the hospital in the lawsuit.

On January 21, 2010, the hospital filed a motion for summary judgment. Respondent filed an opposition to the motion for summary judgment, to which he attached affidavits executed on February 18, 2010 and purportedly signed by two of the hospital's employees, Latoya Washington and Curtis Day, and notarized by respondent. Later, it was revealed that the affidavits contained false information and that the affiants' signatures were forged. Specifically, the affidavits falsely stated that the affiants heard the hospital's administrator, Linda Daville, accuse Ms. Wilson of stealing items belonging to the hospital's housekeeping department.

On March 24, 2010, Mr. Day was scheduled to be deposed. Just prior to the deposition, Mr. Day apparently told Mr. Riche that respondent called him the night before and asked him not to appear for the deposition. The hospital's chief operations officer, Lonnie Dufour, was also present during Mr. Day's statement to Mr. Riche. During his deposition, Mr. Day testified that he had never seen the affidavit before and that the signature on the affidavit was not his. Mr. Day further

testified that he never heard Ms. Daville accuse Ms. Wilson of stealing the hospital's property.

On May 26, 2010, Ms. Washington was scheduled to be deposed. While in the waiting room just prior to the deposition, Mr. Riche observed respondent approach Ms. Washington and have her sign a document believed to be a second affidavit. The second affidavit, dated May 25, 2010, was apparently pre-notarized by respondent and pre-witnessed by his staff. Ms. Washington signed the document without reading it and without it being explained to her.

Regarding the original February 18, 2010 affidavit, Ms. Washington testified during her deposition that respondent's staff asked if she would sign an affidavit on Ms. Wilson's behalf, and she agreed. Later, she received an affidavit in the mail with instructions to sign and return it to respondent. Ms. Washington indicated that she did not sign or return the affidavit, and the document was still at her home. According to Ms. Washington, the affidavit contained an incorrect date, identified the wrong parish of her residence, and contained other false information. Contrary to the affidavit, Ms. Washington never heard Ms. Daville accuse Ms. Wilson of stealing the hospital's property. Ms. Washington could not explain how her purported signature came to appear on the affidavit dated February 18, 2010.

Subsequently, the hospital moved to strike both affidavits and proceed with the motion for summary judgment. Respondent moved to strike Mr. Day's affidavit but not Ms. Washington's. On August 16, 2010, the judge granted the hospital's motion for summary judgment and dismissed Ms. Wilson's lawsuit.

In October 2010, Mr. Champagne, on the hospital's behalf, filed a disciplinary complaint against respondent. In response, respondent denied notarizing or filing the two fraudulent affidavits dated February 18, 2010. He also denied asking Mr. Day not to appear for his deposition. He claimed that his staff prepared and signed the affidavits without his knowledge. Finally, he suggested that Mr. Champagne's

disciplinary complaint was simply retaliation for him filing an appeal on Ms. Wilson's behalf.

*Count IV – The Bajoie Matter*

On December 12, 2009, Angela Bajoie was involved in an automobile accident while working as a mail carrier for the United States Postal Service. On December 30, 2009, she hired respondent to represent her in the related personal injury matter.

In June 2010, respondent settled Ms. Bajoie's claim with the defendant insurance company for a total of $8,500. Thereafter, respondent worked on confirming a workers' compensation lien, which delayed the disbursement of the settlement funds.

After experiencing difficulty communicating with respondent and unaware he had settled her claim, Ms. Bajoie wrote to respondent on August 26, 2010. In her letter, she complained about the lack of communication and requested the return of her file so she could handle the claim herself. On August 31, 2010, respondent sent a letter to Ms. Bajoie, informing her of the settlement. However, Ms. Bajoie never received this letter because it was mailed to the wrong address. By September 30, 2010, Ms. Bajoie still had not received her settlement funds or a status update.

In early October 2010, Ms. Bajoie filed a disciplinary complaint against respondent. On October 4, 2010, the defendant insurance company forwarded the settlement check to respondent. On October 21, 2010, Ms. Bajoie accepted her portion of the settlement proceeds. Respondent answered the disciplinary complaint on December 9, 2010, acknowledging there was a breakdown in communication but indicating he and Ms. Bajoie worked things out. However, Ms. Bajoie countered that respondent settled the claim without her knowledge, which respondent denied.

8

Patsy Godfrey was injured in an automobile accident on October 6, 2008. When her first attorney passed away, Ms. Godfrey hired respondent in April 2010 to conclude her personal injury case.

Ms. Godfrey claimed respondent accepted the representation based on a contingency fee of 25% if settled or concluded at the trial court level and 40% if appealed. She produced a copy of the purported contingency fee contract to this effect. Respondent claimed he accepted the representation based on a contingency fee of 25% if settled pre-lawsuit, $33\frac{1}{3}$% if suit was filed, and 40% if appealed. He disputed the authenticity of the contract Ms. Godfrey produced and contended that the original contract was stolen from his office, leaving him with no documentary evidence of the fee agreement.

On February 23, 2012, Ms. Godfrey's claim was settled at mediation. On March 14, 2012, the defendant issued a settlement check for $257,339. Upon receipt, respondent either forged or allowed someone else to forge Ms. Godfrey's endorsement on the settlement check before depositing it into his client trust account on March 21, 2012. Ms. Godfrey's name was signed to the check without her knowledge or consent, and she did not sign the Receipt and Release form.

Also on March 21, 2012, respondent issued checks from his trust account to disburse the settlement proceeds as follows: a check in the amount of $146,179.40 to Ms. Godfrey and a check in the amount of $94,324 to himself. Ms. Godfrey initially refused to negotiate her check because respondent had taken a $33\frac{1}{3}$% fee instead of a 25% fee, and she disputed that respondent earned $23,324 of the fee. When Ms. Godfrey disputed the fee, respondent informed her they could resolve the matter through fee dispute arbitration. However, respondent failed to deposit or maintain the disputed funds in his trust account until the dispute was resolved and

took no steps to resolve the dispute. On April 20, 2012, Ms. Godfrey ultimately negotiated the check issued to her.

Ms. Godfrey was injured in another automobile accident on July 19, 2011 and hired respondent to handle that personal injury claim also. Respondent accepted the representation based on an oral contingency fee contract.

In February 2012, respondent settled the matter for $12,062.53. Upon receipt of the settlement check, respondent either forged or allowed someone else to forge Ms. Godfrey's endorsement on the check before depositing it into his trust account on March 7, 2012. Ms. Godfrey's name was signed to the check without her knowledge or consent, and she did not sign the Receipt and Release form.

On March 8, 2012, respondent issued checks from his trust account to disburse the settlement proceeds as follows: a check in the amount of $7,667.94 to Ms. Godfrey and a check in the amount of $3,169.63 to himself. Respondent claimed he was owed a fee of $33 \frac{1}{3}\%$ while Ms. Godfrey claimed the fee agreement entitled respondent to 25%. Although Ms. Godfrey initially refused to negotiate her check, she ultimately did so on April 20, 2012.

In early April 2012, Ms. Godfrey filed a disciplinary complaint against respondent. In response, respondent indicated that his administrative assistant filed a police report when the contingency fee contract was stolen from his office. He also indicated that Ms. Godfrey has a key to his office because her company cleans the building, and he accused her of stealing the contract. Finally, respondent disputed Ms. Godfrey's claim that he had agreed to a 25% contingency fee for handling civil lawsuits. Nevertheless, he accepted the 25% fee for the second matter he handled for Ms. Godfrey because he did not have a signed contingency fee agreement.

10

# DISCIPLINARY PROCEEDINGS

In June 2017, the ODC filed formal charges against respondent, alleging that his conduct as set forth above violated the following provisions of the Rules of Professional Conduct: Rules 1.1 (failure to provide competent representation to a client), 1.3 (failure to act with reasonable diligence and promptness in representing a client), 1.4 (failure to communicate with a client), 1.5(a) (charging an unreasonable fee), 1.5(c) (contingency fee agreements), 1.15(e) (failure to keep disputed property separate until the dispute is resolved), 3.3(a)(1) and (3) (candor toward the tribunal), 5.3(b) (failure to properly supervise a non-lawyer assistant), 8.4(a) (violation of the Rules of Professional Conduct), and 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation).

Respondent answered the formal charges, essentially denying any misconduct, as he stated in his written responses to the disciplinary complaints filed against him. He also complained that the formal charges were filed between five and ten years after the disciplinary complaints were filed. The matter then proceeded to a formal hearing on the merits.

## RESPONDENT'S TESTIMONY

Regarding the Smith matter, respondent testified that Ms. Smith wanted the succession done in a certain way, and there was nothing improper about omitting the siblings. He also testified that it took "some time" to do it the way she wanted it done, but he obtained a judgment of possession for her. Respondent disputed Ms. Smith's claim that he failed to return her telephone calls and, instead, indicated he had a lot of communication with her. He believed he met with her every other week and did a lot of work for her, for which he only charged $1,500. He also testified that Ms. Smith ultimately terminated his services on December 6, 2017.

11

Regarding the Larce matter, respondent indicated he handled the case *pro bono*, and Ms. Larce wanted sole custody of the child. He acknowledged that his first filing on Ms. Larce's behalf contained an error, which was significant because it requested the child's father be given sole custody. Respondent also claimed he drove to Lake Charles on two or three occasions for hearings that were continued. He missed one hearing because, according to him, the notice was sent to the wrong address. He also acknowledged that the child's father was awarded sole custody.

With respect to the Wilson matter, respondent testified that he was not sure who signed the two fraudulent affidavits submitted in opposition to the hospital's motion for summary judgment. However, he admitted he is responsible for what goes on in his office. When he learned the affidavits were not correct, he filed a motion to strike. Finally, respondent denied telling a witness not to show up for a deposition and denied pre-notarizing an affidavit for another witness.

With respect to the Bajoie matter, respondent testified that he settled Ms. Bajoie's case without her knowledge based on a contract giving him authority to do so. Specifically, respondent believed the phrase "handle my case as he thinks best" gave him authority to settle the case without Ms. Bajoie's consent. Respondent further indicated that Ms. Bajoie was upset over the amount of the settlement and the length of time it took her to receive her funds. Finally, respondent testified that he was not hired to handle Ms. Bajoie's workers' compensation claim.

Regarding the Godfrey matter, respondent testified that Ms. Godfrey signed a contract, but there was a dispute as to the fee specified in the contract. He charged Ms. Godfrey a $33\frac{1}{3}$% fee, and she claimed the contract provided for a 25% fee. Respondent claimed the actual contract was stolen from his office, and he believed Ms. Godfrey "doctored" the contract in her possession.

Ms. Sparrow, who has been respondent's legal secretary for the past twenty-three years, testified that she types respondent's correspondence and pleadings but she does not draft pleadings. She also puts court dates on the calendar when the office received notices. Additionally, she indicated that, while she occasionally talks with clients, usually respondent or respondent's law clerk will handle client calls.

Regarding the Larce matter, Ms. Sparrow testified that she never received notice of the hearing at which respondent failed to appear. She indicated that respondent moved his office to a new location right before the notice was purportedly served on him, and they were still having trouble with mail being sent to the old address. She also claimed respondent's law clerk at the time, Armer Bright, drafted the motion for change of custody and got the information in the motion from Ms. Larce.

Regarding the Wilson matter, Ms. Sparrow testified that she spoke with Curtis Day over the telephone about the February 18, 2010 affidavit and indicated that she signed Mr. Day's name to the affidavit with his permission. She cannot remember if she signed Ms. Washington's name to her February 18, 2010 affidavit. However, she believed she may have notarized the affidavits even though the notary signatures look to her like respondent's signature. She further indicated she and respondent's law clerk, Mr. Bright, signed both affidavits as witnesses. Additionally, she testified that respondent suspended Mr. Bright for three days as a result of the affidavits because Mr. Bright was supposed to be supervising her work. Regarding Ms. Washington's May 25, 2010 affidavit, Ms. Sparrow indicated that she signed it as a witness but was not present at Ms. Washington's deposition when Ms. Washington signed it.

With respect to the Bajoie matter, she testified that she communicated with Ms. Bajoie about the status of her case on numerous occasions because Ms. Bajoie

13

called constantly. As such, she claimed Ms. Bajoie was aware of her settlement. Ms. Sparrow also indicated that respondent only represented Ms. Bajoie in the personal injury case and not with respect to her workers' compensation claim.

Finally, regarding the Godfrey matter, Ms. Sparrow testified that Ms. Godfrey asked for a copy of the contract, but Ms. Godfrey never told her she lost her original copy. Ms. Sparrow further indicated that she did not provide Ms. Godfrey with another copy of the contract. In fact, when they looked for the contract in respondent's office, it was missing. Because Ms. Godfrey cleaned respondent's office, Ms. Sparrow reported her to the police as having stolen the contract.

LINDER SMITH'S TESTIMONY

Ms. Smith testified that she told respondent to do what he needed to do to transfer her deceased sister's Baton Rouge property so the property could be sold. She indicated that the decedent's siblings were not listed on the judgment of possession, which caused problems when she tried to sell the property. Two sales of the property fell through because a good title on the property could not be obtained. Ms. Smith further testified that respondent would not call her back and that her sister's estate never received the refund from the Louisiana Department of Revenue respondent indicated it was due. Finally, she indicated that another attorney helped fix the succession, and she was able to sell the property.

LYDIA LARCE'S TESTIMONY

Ms. Larce testified that she hired respondent to help her obtain domiciliary custody of her child while everything else regarding custody remained the same. Instead, her child's father was given sole custody because respondent did not show up for a hearing. She claimed respondent also missed several other hearings, did not return her telephone calls, and did not keep her updated about the status of the case.

14

Ms. Larce then testified that, when a mistake occurred, respondent blamed it on his paralegal. She further claimed that the erroneous change of custody pleading was allegedly drafted by respondent's law clerk. According to Ms. Larce, respondent took no action to correct the erroneous pleading and took no action to vacate or annul the judgment giving her child's father sole custody. She also indicated that she did not see the erroneous pleading until after sole custody had been awarded to her child's father. Ms. Larce further testified that she was ordered to pay child support to the father because he had sole custody.

## CURTIS DAY'S TESTIMONY

Mr. Day, who worked at Bunkie General Hospital for twenty-five years, testified he was not working at the time of the alleged incident involving Ms. Wilson. He also testified that the signature on the February 18, 2010 affidavit was not his and that he never talked to anyone in respondent's office or told anyone in his office the alleged facts presented in the affidavit. Finally, he indicated that he did not remember receiving a call from respondent telling him not to show up for his deposition.

## RANDALL CHAMPAGNE'S TESTIMONY

Mr. Champagne testified that, when he deposed both Latoya Washington and Curtis Day about the February 18, 2010 affidavits they purportedly signed, both said the signature on their affidavit was not theirs. Additionally, Mr. Day indicated he was asked to sign an affidavit but refused to do so. Ms. Washington indicated she received an affidavit from respondent's office but did not sign it because it had incorrect information on it.

15

## KEVIN RICHE'S TESTIMONY

Mr. Riche testified that he attended Latoya Washington's deposition with Mr. Champagne and saw her sign a pre-notarized affidavit respondent handed her before her deposition. He also confirmed that, just prior to Curtis Day's deposition, Mr. Day said respondent told him not to appear for the deposition.

## ANGELA BAJOIE'S TESTIMONY

Ms. Bajoie testified that she hired respondent to handle her workers' compensation claim and her personal injury claim. She testified that respondent would not return her telephone calls and did not keep her updated about the status of her case. She also noted that respondent's August 31, 2010 letter to her was sent to the wrong address. She claimed she did not authorize the settlement and only learned of it after she filed a disciplinary complaint against respondent. Additionally, she never saw the settlement check and did not authorize respondent to sign her name on the check. Finally, she indicated that her purported signature on the release was not hers.

## PATSY GODFREY'S TESTIMONY

Ms. Godfrey testified that her JaniKing franchise cleans respondent's office and admitted that she has a key to his office. However, she denied taking anything from his office. Regarding the fee agreement she had with respondent, she believed the agreed-upon fee was 25% because she had agreed to perform "leg work" for respondent. She lost her copy of the contract but obtained another copy from respondent's secretary, which copy indicated a 25% fee. Nevertheless, respondent charged a $33\frac{1}{3}$% fee. Ms. Godfrey testified that she told respondent not to negotiate the settlement check until the fee dispute was settled, but the check was deposited anyway. When she continued to dispute the fee, respondent claimed her contract

16

was stolen from his office and called the police. Finally, she testified that she did not endorse the settlement check or sign the release.

Mr. Dominique, who worked for respondent as a law clerk for two and a half years while he was in law school, testified regarding the Godfrey matter. Mr. Dominique indicated that, on March 28, 2012, Ms. Sparrow asked him if he had removed Ms. Godfrey's contract from her file. When he denied doing so, Ms. Sparrow called the police, who came to the office and questioned Ms. Sparrow. No one else asked him about the missing contract. He understood that Ms. Godfrey had a key to respondent's office because she cleaned the building and that Ms. Godfrey was disputing respondent's fee, which was set forth in the contract.

*Hearing Committee Report*

Based upon the evidence and testimony presented at the hearing, the hearing committee made the following factual findings:

The Smith Matter – Clearly, respondent had not handled many successions before this case. He lacked diligence and competence in performing the work needed to resolve the succession. A communication issue also existed between respondent and Ms. Smith. Based on these facts, the committee determined respondent violated Rules 1.1, 1.3, and 1.4 of the Rules of Professional Conduct.

The Larce Matter – Even though respondent handled this matter *pro bono*, it still needed to be handled competently. A typographical error occurred but does not appear to have been remedied. Additionally, it appears that Ms. Larce was better off before respondent represented her. A communication issue existed, and respondent lacked diligence. Based on these facts, the committee determined respondent violated Rules 1.3 and 1.4.

17

The Wilson Matter – This matter involves a very serious allegation of intentional obstruction of the law. This matter also involves respondent's failure to supervise his employees, who engaged in the unauthorized practice of law or outright fraud. Based on these facts, the committee determined respondent violated Rules 3.3(a)(1), 5.3(b), and 8.4(c).

The Bajoie Matter – This matter involves a failure to communicate. Ms. Bajoie alleges she was unable to contact respondent. She asked him to withdraw from the representation, but after she did so, he continued the representation. She testified that she did not know her case had settled until after she terminated the representation. Based on these facts, the committee determined respondent violated Rules 1.4 and 8.4(a).

The Godfrey Matter – This matter involves a fee dispute. According to the committee, this matter should have been handled through the LSBA Fee Dispute Resolution Program. Furthermore, respondent should have escrowed the disputed amount, which does not appear to have occurred. Based on these facts, the committee determined respondent violated Rules 1.3, 1.15(e), and 8.4(c).

The committee then determined that respondent violated duties owed to his clients and the legal profession. While he acted negligently, he also caused actual harm to his clients. After considering the ABA's *Standards for Imposing Lawyer Sanctions*, the committee determined the baseline sanction is suspension.

In aggravation, the committee found a prior disciplinary record, a pattern of misconduct, and substantial experience in the practice of law (admitted 1991). In further aggravation, the committee noted respondent's submission of false affidavits. In mitigation, the committee found full and free disclosure to the disciplinary board and a cooperative attitude toward the proceedings, as well as a delay in the disciplinary proceedings.

After also considering this court's prior jurisprudence addressing similar misconduct, the committee recommended that respondent be suspended from the practice of law for two years, with one year and six months deferred. The committee further recommended that respondent submit the fee dispute with Patsy Godfrey to the LSBA Fee Dispute Resolution Program. One committee member dissented and would have recommended that only a year of the suspension be deferred.

Both respondent and the ODC filed objections to the hearing committee's report.

*Disciplinary Board Recommendation*

After reviewing this matter, the disciplinary board determined that the hearing committee's factual findings are not manifestly erroneous. Additionally, the board found that, in the Smith matter, respondent owes Ms. Smith a refund of $2,440 in attorney's fees and costs due to his lack of competence in handling the succession. In the Bajoie matter, Ms. Bajoie did not authorize respondent to sign her name on her settlement check; nevertheless, someone else endorsed her name on the check, and the check was deposited into respondent's trust account without Ms. Bajoie's knowledge. In the Godfrey matter, the board additionally found that respondent or one of his employees forged Ms. Godfrey's signature on the back of both of her settlement checks, and both checks were then deposited into respondent's trust account. Respondent also failed to obtain Ms. Godfrey's signature on the release forms. Based on the testimony of both Ms. Godfrey and respondent, the board found that respondent improperly held $2,000 from Ms. Godfrey's settlement, which amount should be refunded to her. Finally, regarding the Godfrey matter, the board accepted the testimony of respondent and his secretary that his fee was $33 \frac{1}{3}$% since a lawsuit had already been filed on Ms. Godfrey's behalf. As such, the board found that Ms. Godfrey is not due any refund of attorney's fees. Regardless, the board

19

determined that respondent should have placed the disputed funds into his trust account until the fee dispute was resolved.

Based on these facts together with the committee's factual findings, the board determined respondent violated Rules 1.1, 1.3, 1.4, 1.5(a), and 8.4(a) of the Rules of Professional Conduct in the Smith matter. With respect to the Larce matter, the board determined respondent violated Rules 1.1, 1.3, 1.4, and 8.4(a). In the Wilson matter, the board determined respondent violated Rules 3.3(a)(1), 3.3(a)(3), 5.3(b), 8.4(a), and 8.4(c). The board agreed with the committee that respondent violated Rules 1.4 and 8.4(a) in the Bajoie matter. Finally, with respect to the Godfrey matter, the board determined respondent violated Rules 1.3, 1.5(c), 1.15(e), 8.4(a), and 8.4(c).

The board then determined that respondent negligently violated duties owed to his clients, the legal system, and the legal profession. His conduct caused actual harm as follows: (1) two acts of sale of fell through in the Smith matter because the succession was not in order, and Ms. Smith paid $2,440 in legal fees and costs for unsatisfactory work, which another attorney had to correct and complete; (2) Ms. Larce lost custody of her child; (3) Bunkie General Hospital was required to take additional depositions as a result of the false affidavits created by respondent's office; (4) Ms. Bajoie was not afforded proper communication with respondent; and (5) Ms. Godfrey's funds were improperly withheld from her settlement check and have not been repaid to her. After considering the ABA's *Standards for Imposing Lawyer Sanctions*, the board determined that the baseline sanction is suspension.

In aggravation, the board found a prior disciplinary record, a pattern of misconduct, multiple offenses, refusal to acknowledge the wrongful nature of the conduct, substantial experience in the practice of law, and indifference to making restitution. In mitigation, the board found full and free disclosure to the disciplinary

20

board and a cooperative attitude toward the proceedings, as well as a delay in the disciplinary proceedings.

After further considering this court's prior jurisprudence addressing similar misconduct, the board recommended respondent be suspended from the practice of law for two years, with all but one year and one day deferred. The board further recommended that respondent be ordered to make restitution to Linder Smith in the amount of $2,440 and to Patsy Godfrey in the amount of $2,000. Finally, the board recommended respondent be assessed with all costs and expenses of these proceedings. One board member dissented and would recommend respondent be suspended from the practice of law for three years.

Both respondent and the ODC filed objections to the disciplinary board's recommendation. Accordingly, the case was docketed for oral argument pursuant to Supreme Court Rule XIX, § 11(G)(1)(b).

## DISCUSSION

Bar disciplinary matters fall within the original jurisdiction of this court. La. Const. art. V, § 5(B). Consequently, we act as triers of fact and conduct an independent review of the record to determine whether the alleged misconduct has been proven by clear and convincing evidence. *In re: Banks*, 09-1212 (La. 10/2/09), 18 So. 3d 57. While we are not bound in any way by the findings and recommendations of the hearing committee and disciplinary board, we have held the manifest error standard is applicable to the committee's factual findings. *See In re: Caulfield*, 96-1401 (La. 11/25/96), 683 So. 2d 714; *In re: Pardue*, 93-2865 (La. 3/11/94), 633 So. 2d 150.

The record of this matter supports a finding that respondent failed to provide competent representation to clients, neglected legal matters, failed to communicate with clients, failed to refund unearned fees and unused costs, failed to properly

21

supervise his non-lawyer staff, resulting in false affidavits being filed in the court record, failed to reduce a contingency fee agreement to writing, forged client signatures on settlement checks, and failed to place disputed funds in his trust account. Based on these facts, respondent has violated the Rules of Professional Conduct as found by the disciplinary board.

Having found evidence of professional misconduct, we now turn to a determination of the appropriate sanction for respondent's actions. In determining a sanction, we are mindful that disciplinary proceedings are designed to maintain high standards of conduct, protect the public, preserve the integrity of the profession, and deter future misconduct. *Louisiana State Bar Ass'n v. Reis*, 513 So. 2d 1173 (La. 1987). The discipline to be imposed depends upon the facts of each case and the seriousness of the offenses involved considered in light of any aggravating and mitigating circumstances. *Louisiana State Bar Ass'n v. Whittington*, 459 So. 2d 520 (La. 1984).

Respondent violated duties owed to his clients, the legal system, and the legal profession, causing actual harm. The record supports a finding that respondent acted knowingly. The baseline sanction for respondent's misconduct is suspension.

Aggravating factors include a prior disciplinary record, a pattern of misconduct, multiple offenses, refusal to acknowledge the wrongful nature of the conduct, substantial experience in the practice of law, and indifference to making restitution. Mitigating factors present are respondent's full and free disclosure to the disciplinary board, his cooperative attitude toward the proceedings, and a delay in the disciplinary proceedings.

Turning to the issue of an appropriate sanction, we find guidance from two cases: *In re: Evans*, 16-1115 (La. 12/6/16), 218 So. 3d 1015, and *In re: Jones*, 12-1700 (La. 1/25/13), 106 So. 3d 1019. In *Evans*, an attorney neglected numerous legal matters, failed to communicate with numerous clients, failed to provide

competent representation, failed to refund unearned fees, failed to provide accountings to clients, failed to reduce contingency fee agreements to writing, failed to properly supervise non-lawyer assistants, failed to keep one client's information confidential, and failed to cooperate with the ODC in two investigations. The attorney had a prior disciplinary record, but the offenses were remote in time. For this misconduct, we imposed a suspension from the practice of law for three years, with two years deferred. In *Jones*, an attorney notarized legal documents outside the presence of the signatories and caused the documents to be filed in conveyance records, closed a real estate transaction that was part of an illegal "house flipping" scheme, and signed pleadings that omitted two of seven heirs and then failed to take any remedial action after learning of the error. The attorney had no prior disciplinary record. For this misconduct, we imposed a two-year suspension.

In light of respondent's extensive prior disciplinary record, as well as the other aggravating factors present, a two-year suspension, which is on the harsher end of the range in the jurisprudence discussed above, would typically be warranted. However, given the significant delay in these disciplinary proceedings, we will impose a one year and one day suspension from the practice of law. We will also order respondent to make restitution to Ms. Smith in the amount of $2,440 and to Ms. Godfrey in the amount of $2,000.

## DECREE

Upon review of the findings and recommendations of the hearing committee and disciplinary board, and considering the record, briefs, and oral argument, it is ordered that Donald R. Dobbins, Louisiana Bar Roll number 20537, be and he hereby is suspended from the practice of law for a period of one year and one day. It is further ordered that respondent shall make restitution, with legal interest, in the amount of $2,440 to Linder Smith and in the amount of $2,000 to Patsy Godfrey.

All costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court's judgment until paid.

01/29/20

# SUPREME COURT OF LOUISIANA

## NO. 2019-B-1346

## IN RE: DONALD R. DOBBINS

*ATTORNEY DISCIPLINARY PROCEEDING*

**WEIMER, J.**, concurs in part and dissents in part.

As recommended by the Disciplinary Board, I would impose a two-year suspension from the practice of law, with all but one year and one day deferred.

I otherwise agree with the opinion.

**SUPREME COURT OF LOUISIANA**

**No. 2019-B-01346**

**IN RE: DONALD R. DOBBINS**

Attorney Disciplinary Proceeding

**CRICHTON, J., concurs in part, dissents in part and assigns reasons**:

I agree with the majority opinion that respondent has violated the Rules of Professional Conduct as found by the disciplinary board. However, I disagree with the sanction imposed, as I find it unduly lenient.

Respondent was admitted to the practice of law in 1991, and thus, has nearly thirty years of experience in our profession. Nevertheless, respondent demonstrates a history of serious misconduct, much of which includes dishonesty. Specifically, among other violations, the record establishes that respondent forged or allowed someone to forge documents in order to negotiate settlement checks issued in the course of his representation of a client, and respondent created and filed false affidavits in his representation of a plaintiff against her former employer. As the majority notes, respondent's multiple violations of the Rules of Professional Conduct resulted in actual damage sustained by clients and the legal system. In fact, my view of the record and respondent's behavior demonstrates several of respondent's clients would likely have received better legal outcomes through self-representation.

Moreover, in my view, respondent veers away from accepting responsibility for his actions and appears to implicate other individuals for every charge against him. Not only does respondent accuse a client of stealing a contingency contract from his office, he even goes so far as to malign the prosecuting attorney for the Office of Disciplinary Counsel, Ms. Karen H. Green. Both in brief and in oral

1

argument before this Court, respondent lobbed scandalous allegations against Ms. Green, all without even a scintilla of evidence (alleging "a personal vendetta that she has against me for confronting her about possible misconduct when she was in private practice.") I find that castigating one's opponent on a personal level, especially in a disciplinary proceeding, is both obstructionistic and opprobrious. See La. Sup. Ct. Rule VII, §7, which provides that "[t]he language used in any brief or document filed in this court must be courteous, and free from insulting criticism of any person, individually or officially. . . ." Moreover, respondent's conduct in this respect implicates rules 3.1, 3.3 and 4.4(a) of the Louisiana Rules of Professional Conduct.

The Lawyer's Oath mandates that we "maintain the respect due to courts of justice and judicial officers" and requires us to "pledge fairness, integrity and civility not only in court but also in all written and oral communications." I find respondent's "blame game" as to former injured clients and the opposing lawyer, whose job it is to seek accountability for ethical violations, to be in direct contravention to the Rules of Professional Conduct and the Lawyer's Oath.

Accordingly, I disagree with the majority as to the overly lenient sanction and would impose no less than a three year actual suspension, if not disbarment.

**SUPREME COURT OF LOUISIANA**

**No. 2019-B-01346**

**IN RE: DONALD R. DOBBINS**

Attorney Disciplinary Proceeding

**CRAIN, J.**, concurs in part and dissents in part for the reasons assigned by Crichton, J.